# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

## CASE NO.:

TATIANA MARCHE DENSON,

      Plaintiff,

vs.

PNC BANK, N.A.,

      Defendant.

_____/

## COMPLAINT

Plaintiff, TATIANA MARCHE DENSON ("Tatiana") sues Defendant, PNC BANK, N.A. ("PNC"), and states:

## INTRODUCTION

Banking while black—that was Tatiana's crime. Tatiana—a business owner and former candidate for the Florida House of Representatives—went to PNC to open a business checking account. Tatiana soon learned not all customers are created equal at PNC when she was excessively interrogated and suspected of wrongdoing by a branch manager, who treated her like a common criminal for absolutely no reason other than the color of her skin and deeply held prejudices. Even more shocking (or perhaps no longer so shocking) the branch manager himself called the police on Tatiana—all with the bank's own security guard standing a mere few yards away.

Tatiana's story is yet another disappointing chapter in the tragic perpetuation of the stereotypical "Angry Black Woman" and the escalating weaponization of 911. Tatiana was demonized, degraded, and traumatized when all she wanted to do was open a business checking account—which any white customer could have had done without a problem. Despite an outwardly progressive stance, PNC, like so many other American corporations, is quick to call on law

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Fort Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

enforcement to handle any black customer it chooses not to serve, or be suspicious of, solely due to the customer's skin color.

## JURISDICTION

1.      This is an action against PNC to recover damages pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, as amended, ("Section 1981").

2.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 because the Complaint alleges a federal claim and requires the resolution of substantial questions of federal law.

3.      Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Tatiana's state law claims because the state claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Further, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (a) Plaintiff and Defendant are citizens of different states; and (b) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      This Court has personal jurisdiction over PNC because: (a) PNC is operating, present, and doing business within this jurisdiction, and (b) PNC's breaches and illicit activity occurred within this jurisdiction.

6.      Venue in this District is proper under 28 U.S.C. § 1391(b) because all of the events and omissions complained of took place in the Middle District of Florida.

## PARTIES

7.      Tatiana is a citizen of the United States, a resident of the State of Florida, and a person with legal standing to bring a claim under Section 1981.

8.      Tatiana is a 40-year-old woman of African American descent and a mother of two.

9.      PNC is the primary subsidiary of The PNC Financial Services Group, Inc.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

10.    PNC designates its main office in Pittsburg, Pennsylvania, and is a citizen of Pennsylvania for diversity purposes.

11.    According to PNC's most recent quarterly report, PNC provides banking, investment, and mortgage products and services, as well as consumer and commercial finance. PNC has 2,321 locations and 9,072 ATMs across 37 states and the District of Columbia. PNC receives substantial revenue through its relationships with business owners.

12.    For example, In 2018, the same year Tatiana was denied the opportunity to open a business account, PNC's Fourth Quarter Report shows average commercial lending balances grew by $2.3 billion reflecting seasonal growth in PNC's multifamily agency warehouse, lending within the real estate business, and loan growth across the corporate banking, business credit and equipment finance businesses.

13.    Tatiana was simply hoping to form a commercial relationship with PNC just as many other white business owners.

### BACKGROUND AND GENERAL ALLEGATIONS

14.    PNC serves the needs of individuals seeking personal banking, provides services to small businesses, as well as offers commercial banking solutions. As part of its small business services, PNC offers business checking accounts, business savings accounts, certificates of deposit, and payroll services.[1] As part of its business checking account services, PNC offers its business customers the convenience of paying vendors, employees, and all other persons and/or entities directly from the business consumer's account.[2]

---

[1] *See* https://www.pnc.com/en/small-business/banking/business-checking-overview.html (last visited August 7, 2019).
[2] *See* https://www.pnc.com/en/small-business/banking/online-business-services/online-banking-and-bill-pay.html (last visited August 25, 2019).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

15.     At bottom, PNC offered to the general public the option of applying for a business account online, by phone, or by walking into any of its branches.

16.     If a person chooses to apply for a business account in person, the applicant must bring an employer identification number ("EIN"), a government-issued photo ID, a secondary form of identification, as well as documents verifying business registration and authority to act on behalf of and control, manage, or direct the business.[3]

17.     On August 3, 2018, Tatiana—through her attorneys—filed Articles of Incorporation for her new business with the Florida Department of State: Tatiana Marche Denson Brand & Talent Management Firm, LLC.

18.     Tatiana's company focuses on generating publicity and brand positioning for professional talent, products and services.

19.     With her attorneys and documents in order, Tatiana obtained a tax identification number and next needed to open a bank account for her new business.

20.     Tatiana researched many banks and was taken by PNC's promoting itself as an advocate for women's business.

21.     She did not realize that PNC meant white women.

22.     Tatiana called PNC bank and requested to open a business checking account and based upon her location, was directed to the PNC branch located at 2009 Fowler Avenue, Tampa, Florida 33612 (the "Fowler Ave. Branch").

23.     Apparently, PNC forwarded Tatiana's request to the Fowler Ave. Branch.

24.     On August 16, 2018, Mr. Vandermolen, the Fowler Ave. Branch manager called

---

[3] *See* https://www.pnc.com/en/small-business/banking/business-checking-overview/business-checking.html#need (last visited August 25, 2019).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

and emailed Tatiana to introduce himself and to set up a time to meet.

25.     In the subject line of Mr. Vandermolen's email to Tatiana, he wrote "Subject: PNC Bank - TATIANA DENSON BRAND & TALENT MANAGEMENT FIRM."

26.     On August 24, 2018, Mr. Vandermolen and Tatiana spoke over the phone in what was a courteous and pleasant conversation and set a meeting for the following Wednesday, August 29, 2018 at 3:00 p.m. During the conversation, Tatiana answered Mr. Vandermolen's questions and explained to him the scope and nature of her business.

27.     Mr. Vandermolen knew what type of business Tatiana was opening and likely looked up the business on Sunbiz.org.

28.     On August 29, 2018, Tatiana went to the Fowler Ave. Branch, arriving early for her scheduled meeting with Mr. Vandermolen.

29.     As soon as Tatiana met Mr. Vandermolen in person, she could tell from the look on Mr. Vandermolen's face, that given her 'non-black sounding name' and 'non-black sounding telephone voice,' that he had believed Tatiana was a white female customer, and only now learned that Tatiana was black.

30.     Mr. Vandermolen escorted Tatiana to his office which was a glass enclosure without a door.  From that very first second, Mr. Vandermolen was cold, rude, and demeaning.

31.     Mr. Vandermolen treated Tatiana as if she were a common criminal right from the start. As African Americans in corporate spaces are often forced to do, Tatiana shrugged off Mr. Vandermolen's initial unpleasantries. She handed Mr. Vandermolen two forms of identification, proof of business registration, and a letter from the IRS which showed her EIN.

32.     Nothing about Tatiana's documents or behavior even remotely suggested abuse or fraud. To the contrary, the Articles of Incorporation Tatiana provided were on the letterhead of a

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Miami law firm.

33.     These documents were not enough for Mr. Vandermolen. Mr. Vandermolen asked in a suspicious tone, "Why would the IRS give you a letter?" He also asked, "Why did you set up the business the way you did?" Tatiana repeatedly and graciously responded to each question Mr. Vandermolen posed, and he continued to ask similar question at least seven times.

34.     Mr. Vandermolen then started to make comparisons between Tatiana's business and talent agencies ran by non-black owners. More specifically, he criticized her business name, her business goals, and how she operated her business, suggesting that businesses owned by non-black persons were valid and hers was not.

35.     Mr. Vandermolen finally asked about what "kinds of people" Tatiana managed. Denson plainly stated she could represent all professional talent, but that one of her clients, for example, was a music artist. Unsatisfied with her answer, Mr. Vandermolen then insisted to know the *type* of music Tatiana's client performed.

36.     This interrogation carried on for over 45 minutes. In the end, Mr. Vandermolen refused to accept Tatiana's responses. Based on her previous correspondence with the bank, the documents she provided, and the reasonable explanations she gave, Tatiana could not understand why Mr. Vandermolen declined to accept the information he had.

37.     Mr. Vandermolen did not need highly detailed information about how Tatiana decided her business name, her clients' careers and personal interests, her short and long-term business goals, and the inner workings of her company to establish a business checking account.

38.     For Tatiana, Mr. Vandermolen's excessive questions, unsolicited criticisms, and comparisons fell well outside the purview of information required to open a basic business checking account.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

39.     Tatiana had never witnessed or heard of a white customer at PNC being interrogated in such a way.

40.     In fact, Tatiana had a previous business and business account with a different bank and had never undergone such an interrogation when she opened her account.

41.     Moreover, when she opened her business account at TD Bank after being refused by PNC, Tatiana did not undergo anything like she had experienced at PNC.

42.     Based upon the branch manager's body language, facial expressions, tone of voice, rudeness, bizarre emotional disposition, and his extreme impatience, Tatiana knew Mr. Vandermolen's belligerent interview was happening because of her race and nothing else.

43.     As Mr. Vandermolen became visibly agitated and grew more aggressive, Tatiana asked to speak with a different PNC representative. This only made Mr. Vandermolen even more angry and he told her to leave his office.

44.     During their entire meeting, a black female security guard was positioned in the bank lobby, just a few yards from Mr. Vandermolen's office.

45.     At a complete loss, Tatiana took out her phone. Immediately, Mr. Vandermolen got up, walked over to where Tatiana was seated, stood over her in a threatening manner, and tried to grab the cell phone out of her hands. Tatiana became frightened and told Mr. Vandermolen "Do not touch me!"

46.     Mr. Vandermolen went to the lobby and instructed someone to call 911. According to the 911 recording, one female PNC employee reported to the 911 operator that that Tatiana was "getting violent or loud," while Tatiana sat there quietly.

47.     The statement to law enforcement that Tatiana was "violent or loud" negatively suggested that Tatiana was behaving like a stereotypical angry Black woman. Nothing could be

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

further from the truth. The PNC employee made this statement expecting for Tatiana to be arrested.

48.     For African Americans today, even a seemingly innocuous encounter with law enforcement could lead to a drastic, sometimes fatal result.

49.     A City of Tampa police officer responded to the Fowler Ave. Branch to investigate the disturbance supposedly caused by Tatiana. Tatiana saw his patrol car through the window and went outside. The officer decided almost immediately there was no disturbance. The officer said to Tatiana "I don't know why [PNC] called us here," and then he left.

50.     An African American female PNC security guard was outside Mr. Vandermolen's office. Not once did she try to intervene, because Tatiana's behavior was not "violent or loud." Had Tatiana posed a threat, even for a second, surely the security guard would have been called, if she hadn't herself heard or seen the alleged behavior in the glass-encased and door-less office.

51.     PNC refused to allow Tatiana to open a business account.

52.     Tatiana opened a business checking account at TD Bank shortly thereafter.

53.     What should have been a simple transaction instead resulted in Tatiana enduring an aggressive and unwarranted interrogation like a common criminal, being physically threatened, and Tatiana suffering deep embarrassment and humiliation.

54.     Despite corresponding with PNC corporate headquarters following the abuse, Tatiana was never told how Mr. Vandermolen's questions pertained to opening a business account.

55.     Tatiana was outraged, humiliated, and traumatized.

56.     No one from PNC ever apologized to Tatiana and instead, blamed Tatiana for Mr. Vandermolen's actions.

57.     While Mr. Vandermolen never used any racial slurs or epithets, there is much more to discrimination than just verbal abuse. In her experience living as an African American woman,

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Tatiana can identify when she is being discriminated against, even when there are no racial slurs hurled at her. Tatiana witnessed firsthand the differences in how white individuals were treated and how black individuals were treated.

58.     Tatiana knew from Mr. Vandermolen's facial expression, body language, tone, language, and attitude, that he was discriminating against her because of the color of her skin. Tatiana's knowledge came as a result of nearly 40 years of experience with these issues. Based upon her knowledge and experience, the conduct Tatiana was subjected to at PNC that day was undoubtedly as a result of racial discrimination, consistent with other acts of discrimination and racism to which she had been subjected to throughout her life.

59.     White business owners with even fewer credentials and paperwork than Tatiana were permitted to open business checking accounts at PNC.

60.     No explanation, other than blatant discrimination, exists for the conduct of Mr. Vandermolen and PNC.

61.     All conditions precedent to the commencement of this action have occurred and/or have been waived.

## COUNT I
### Violation of § 1981

62.     Tatiana repeats, realleges and incorporates paragraphs 1 through 61.

63.     As described above, PNC's outrageous conduct constituted discrimination because of Tatiana's race in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, *et seq.*

64.     Through PNC's discriminatory conduct, PNC deprived Tatiana of her right to make and enforce contracts on the same terms as enjoyed by white persons, in violation of 42 U.S.C. § 1981.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

65.     PNC is liable for its employees' actions under the doctrine of *respondeat superior.*

66.     Tatiana is an African American woman. PNC denied Tatiana the opportunity to open a business checking account solely because she is African American.

67.     Tatiana's race was the motivating factor behind PNC discrimination against Tatiana. By virtue of PNC's actions and inactions, as set forth above, PNC has violated § 1981.

68.     PNC's conduct in discriminating against Tatiana due to her race was intentional. PNC engaged in a discriminatory practice with malice, or with reckless indifference to the federally protected rights of Tatiana.

69.     As a direct and proximate result of PNC's actions, Tatiana has suffered personal humiliation, loss of capacity for the enjoyment of life, mental anguish, and embarrassment justifying an award including compensatory damages and punitive damages according to proof against PNC.

70.     As a result of the deprivations of rights at the hands of PNC, Tatiana has retained Rodal Law, P.A, to which Tatiana has agreed to pay a reasonable fee, which she is entitled to recover pursuant to 42 U.S.C. § 1988(b) and otherwise by law.

**WHEREFORE**, Plaintiff, TATIANA MARCHE DENSON, demands judgment against PNC, N.A. for damages, including punitive damages, attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) and for any further relief as this Court deems just and equitable.

*COUNT II*
**DEFAMATION**

71.     Tatiana repeats, reallege and incorporate by reference paragraphs 1-50 as though fully stated herein.

72.     PNC, by and through its employees, explicitly and loudly called Tatiana "violent and loud," and as a result, law enforcement came to the bank to investigate a disturbance.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

73.     The statement that Tatiana was "violent and loud" was heard by other PNC employees and customers. The statement that Tatiana was "violent and loud" was false and defamatory and had the natural tendency to injure her personal reputation and credibility.

74.     This statement lacked good faith and was made intentionally and maliciously with the intent to injure and harm Tatiana. The statement was also intentionally made in an attempt to cover up for PNC's discrimination and to pin the blame on Tatiana.

75.     The statement did in fact cause Tatiana emotional distress, as well as personal humiliation, loss of capacity for the enjoyment of life, mental anguish, and embarrassment.

**WHEREFORE**, TATIANA MARCHE DENSON, demands judgment against PNC, N.A. for the above damages, including punitive, and for any further relief as this Court deems just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, TATIANA MARCHE DENSON, demands a trial by jury of all issues so triable.

Respectfully Submitted,

<u>/s/ *Yechezkel Rodal*</u>
Yechezkel Rodal, Esq.
Florida Bar No.: 91210
E-mail: Chezky@rodallaw.com
Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219
Ft. Lauderdale, Florida 33309
Telephone: (954) 367-5308
Facsimile:  (954) 900-1208

*Counsel for Tatiana*

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com